No. 97,131

KANSAS HEART HOSPITAL, L.L.C. and CARDIAC HEALTH OF WICHITA, INC., *Appellees*, v. BADR IDBEIS, M.D, *et al.*, *Defendants/Appellants*, v. GREGORY F. DUICK, M.D., STEVEN A. HUTCHINSON, M.D., DOUGLAS J. MILFELD, M.D., and LAYNE REUSSER, M.D., *Third-Party Defendants/Appellees*, and CARDIAC ASSOCIATES OF WICHITA, INC., *Appellee*, v. BADR IDBEIS, M.D., *et al.*, *Appellants*, v. SHAKER DAKHILL, M.D., and ROGER ROBERTS, D.O., *Third-Party Defendants/Appellees*.

(184 P.3d 866)

Opinion filed May 16, 2008.

*Todd E. Shadid,* of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, and *Lynn D. Preheim,* of Stinson, Morrison, Hecker, LLP, of Wichita, argued the cause, and *Gary M. Austerman* and *Christopher A. McElgunn,* of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, and *Tyson C. Langhofer,* of Stinson, Morrison, Hecker, LLP, of Wichita, were with them on the briefs for defendants/appellants.

*Ken M. Peterson,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Robert W. Coykendall* and *Richard A. Kear,* of the same firm, *John Terry Moore,* of Moore Martin, LC, of Wichita, and *John F. Reals,* of the Law Offices of John F. Reals, of Wichita, were with him on the briefs for appellees.

The opinion of the court was delivered by

LUCKERT, J.: This case raises several issues related to the validity of a corporate bylaw provision that provided a corporation could redeem stock if a shareholder no longer met ownership eligibility requirements. The parties dispute whether the bylaw section is a restriction on stock and a redemption provision that must be in the articles of incorporation or a restriction on a shareholder's ownership of stock and a purchase provision that may be in the bylaws. We conclude the provision is a valid restriction on the transfer and ownership of stock and, under K.S.A. 17-6426, is a valid bylaw provision. We also conclude the provision was properly invoked, all the remaining parties to this litigation accepted the provision, and the provision was not an impermissible penalty.

### Procedural Background

These issues arise from a dispute among shareholders of two Kansas corporations, Cardiac Health of Wichita, Inc. (CHW) and Cardiac Associates of Wichita, Inc. (CAW), which together own a controlling interest in Kansas Heart Hospital, L.L.C. (KHH). In 2005, CHW's board of directors learned that 14 physicians (Physicians), shareholders of both CHW and CAW, invested in the Kansas Medical Center, L.L.C. (KMC), a hospital that was to be con-

structed in Andover, Kansas. Based on these investments, the CHW board voted to redeem the Physicians' CHW stock under a provision in the corporate bylaws, adopted in February 2000, which prohibited a shareholder from owning any shares in a "competing health care facility." The investors were Badr Idbeis, M.D., Ravi Bajaj, M.D., Gary S. Benton, M.D., Michelle Brown, M.D., Assem Z. Farhat, M.D., Roger E. Evans, M.D., Hussam Farhoud, M.D., Robert H. Fleming, M.D., Randee E. Lipman, M.D., Prakash J. Raghavan, M.D., G. Whitney Reader, M.D., John D. Rumisek, M.D., Donald L. Vine, M.D., and Lyle F. Zepick, M.D.

Soon after the Physicians lost their CHW stock, CAW's board of directors voted to redeem the Physicians' shares in CAW because CAW's articles of incorporation and bylaws required that all of its shareholders also own shares in CHW.

Following the stock redemptions, multiple legal claims arose. Two separate actions were filed in which CHW and CAW sought declaratory judgments regarding the stock redemptions. Along with those actions, KHH alleged claims against Dr. Idbeis involving breach of fiduciary duty and interference with business opportunity. In addition, the parties filed cross-motions for partial summary judgment, and the Physicians filed third-party claims against the directors of CHW and two directors of CAW for breach of fiduciary duty for causing the stock redemption. The district court consolidated the cases, and one physician, Dr. Farhat, was dismissed from the suit with prejudice. For ease of reference, the plaintiffs (KHH, CHW, and CAW) may be referred to as "Corporations."

On February 22, 2006, the district court granted CHW's motion for partial summary judgment, ruling that the redemptions of all the Physicians' stock in CHW, except Dr. Farhat's, "were lawful, authorized and proper." Influenced, in large part, by its February 2006 decision, the district court later granted CAW's motion for partial summary judgment as well. Twelve of the remaining Physicians now appeal the district court's partial summary judgment rulings in favor of CHW and CAW.

### Uncontroverted Facts

Our review is based upon the district court's findings that the

facts material to summary judgment were uncontroverted. The parties do not dispute this conclusion, nor do they quibble with the district court's recitation of those facts. They do, however, argue about each other's statements of facts in their respective briefs. In fact, the Physicians filed a motion to strike portions of the appellees' factual statement. We have considered the record, the district court's findings, and the parties' arguments. Although the Physicians disagree with the appellees' interpretation of various aspects of the record, we do not find a basis to strike portions of the appellees' brief. The motion is denied.

We conclude that the district court correctly determined that the material facts were not controverted. We will, therefore, set out those findings of the district court that are material to the issues on appeal. (Because the district court's findings related to various motions, our recitation will not be in sequence numerically. We have continued with the district court's numbering to assist the court and counsel, however.) The district court found:

"1. The Kansas Heart Hospital, L.L.C., d/b/a Kansas Heart Hospital, referred to as KHH, is a hospital that provides specialized comprehensive cardiovascular health care to the public.

"2. KHH is partially owned by Cardiac Health of Wichita, Inc., (CHW), and Cardiac Associates of Wichita, Inc., (CAW), both of which were formed under the laws of the State of Kansas.

"3. The defendants in this case were shareholders of CHW and CAW.

"4. In 1999, the KHH management committee became concerned that its shareholders may be contemplating the investment in a health care facility to be located on Wichita's west side. The management committee saw this as presenting a potential conflict of interest for any CHW shareholder that chose to invest in that facility.

"5. The issue appeared as an agenda item for the management committee meeting of December 16, 1999, as 'Conflict of interest issues.'

"6. The minutes of the meeting of KHH management committee in December 1999 reflect a discussion of the conflict of interest issue. The minutes also reflect that the following resolution was passed:

'WHEREAS, equity ownership in the Company, either directly or through ownership of shares in Cardiac Health of Wichita, Inc. and Cardiac Associates of Wichita, Inc. is fundamental to the success of the Company; and

'WHEREAS, simultaneous ownership in the Company and a competing health care facility will expose the Company's methods, plans, or proprietary information to competitors which could be harmful to the Company.

'BE IT RESOLVED that any Member of the Company or any shareholder of Cardiac Health of Wichita, Inc. and Cardiac Associates of Wichita, Inc. is prohibited from either directly or indirectly from [sic] ownership in a competing health care facility engaged in cardiology, cardiothorasic [sic] surgery, or vascular surgery within One Hundred (100) miles from the city limits of the city of Wichita, Kansas.'

"Defendant Dr. Idbeis represented to the Board that this restriction be accomplished by amending the operating agreement of KHH, and by changing the corporate bylaws of CHW.

"7. On February 12, 2000, CHW held its Annual Shareholders Meeting. At that meeting, the shareholders discussed the adoption of the restriction on ownership of competing interests. The minutes of the meeting reflect that:

'Dr. Idbeis explained [that] due to proprietary data, information, education, and entrepreneurial learning experience available to shareholders of the Kansas Heart Hospital, L.L.C., its individual investors and its corporate investors (including the shareholders of the corporate investors), that it was in the best interest of the corporation to promptly enact such a restrictive covenant.'

"8. The bylaws provision for CHW was adopted at CHW's Annual Shareholders' Meeting on February 12, 2000. That provision provided:

'No shareholder of the corporation shall be permitted to own either directly or indirectly through any means of ownership, all or any portion of a competing health care facility located within one hundred (100) miles of the city limits of Wichita, Kansas. A "competing health care facility" is defined as any medical hospital or facility specializing in cardiac, cardiothoracic, or vascular care. Any shareholder agrees not to own or in any way, to operate, manage, or control any interest in any competing health care facility as defined above. For purposes of this restriction, any family member, is defined to include spouse, children, testamentary or *inter vivos* trust, or any entity controlled by the shareholder or spouse, children, or related entities, who shall hold any ownership, operate, manage, or control any competing health care facility. In the event a shareholder violates the terms of this restriction, the corporation may compel redemption of the shareholder's stock pursuant to Section 1.5(b) of these bylaws, however, the maximum redemption price shall not exceed Five Hundred Twenty-Five Dollars ($525.00) per share, increased or decreased by any percentage change in the Consumer Price Index. The intent is to prohibit ownership of a competing health care facility, not a limitation of anyone's group practice or facilities integrated within the practice. The Board of Directors shall issue such interpretations as are necessary to carry out the intent of this restriction.'

"The lead-in paragraph of Section 1.5 of the same CHW bylaw provides:

'Section 1.5—OWNERSHIP AND TRANSFER RESTRICTIONS. The corporation has been formed to organize, develop and own an interest in a limited liability company ("LLC") which will own and operate a single specialty free-standing cardiac, cardiothoracic and vascular care hospital ("the Hospi-

tal"). Because of this purpose, certain restrictions upon the ownership and transfer of stock of the corporation shall be imposed as follows:'

"9. At CHW's Annual Shareholders' Meeting on February 12, 2000, the shareholders further adopted an additional resolution to implement the bylaws provision:

'BE IT FURTHER RESOLVED, that notice be given to all shareholders of the [*sic*] Cardiac Health of Wichita, Inc. to provide that anyone who intends to hold an ownership interest in a Competing Healthcare Facility shall be given five (5) business days after notice to give notice of his or her intention to withdraw from the Corporation and ten (10) business days thereafter to tender his or her shares subject to the terms of the maximum redemption price stipulated in the Operating Agreement.'

"The resolution also included the following:

'The ten (10) day period to tender the shares may, upon written request, be extended at the discretion of the Corporation . . . .' "

In addition to these findings, the district court made the following findings regarding the February 12, 2000, shareholders' meeting:

"47. . . . Eleven shareholders were not present, including Drs. Zepick, Reader and Farhat, and did not vote personally or by proxy. The then existing bylaws of CHW allowed for a change in the bylaws upon a majority vote.

"48. At the February 12, 2000, meeting, the shareholders never mentioned, discussed, or voted on, any amendment to CHW's articles of incorporation."

Regarding events occurring after the February 12, 2000, meeting, the district court found:

"10. On February 16, 2000, Dr. Idbeis sent to all shareholders of Cardiac Health and Cardiac Associates a certified letter explaining the new bylaw provision, and the application of the resolution to any shareholder that intended to invest in any competing healthcare facility. The letter concluded: 'In the absence of receiving any notice from you, we presume that you do not wish to have the corporation(s) redeem your shares of stock under the offer presented and that you do not intend to hold an ownership interest in any Competing Healthcare Facility.'

. . . .

"49. In November 2000, CHW's Board of Directors determined that CHW's articles of incorporation and bylaws needed to be modified to permit certain new shareholders.

"50. On November 12, 2000, CHW's Board adopted the following resolution:

'RESOLVED, that the second paragraph of Article Four of the Corporation's Articles of Incorporation be revised as is set forth in Exhibit A, and the Bylaws be revised as is set forth in Exhibit B, and that the proposed revisions be presented to the Shareholders of the Corporation for their approval.'

"51. The proposed revision of the articles of incorporation contained in Exhibit A expanded the eligibility requirements of shareholders. This revision did not contain the restrictive covenant. However, in December 2000, all of the defendants who were then shareholders, except Dr. Farhat, completed a Voting Form wherein they affirmatively approved the Amended and Restated Bylaws. . . . The Bylaws did contain the restrictive covenant. Dr. Farhat was the only defendant-shareholder who indicated his disapproval on the Voting form. The Voting Form provided:

'I, _____, have read and understand the Proposed Revision to the Second Paragraph of Article Four of the Articles of Incorporation of Cardiac Health of Wichita, Inc. as attached in Exhibit A; and the Amended and Restated Bylaws for Cardiac Health of Wichita, Inc. as attached in Exhibit B.

'I hereby indicate my preference below and vote to:

_____ Approve

_____ Disapprove'

"52. CHW circulated the proposed revision to the articles of incorporation . . . and the amended and restated bylaws . . . to the shareholders with the voting form. A majority (92%) of the shareholders approved the expansion of shareholder eligibility and the amended and restated bylaws. (By December 2000, all the current defendants who were then shareholders (except Dr. Farhat) voted to approve the amended and restated bylaws.)

"53. On February 1, 2001, CHW filed an amended and restated articles of incorporation with the Kansas Secretary of State. The amended and restated articles contained Section 1.5(e) that prohibited shareholder ownership in a competing healthcare facility.

"54. CHW's Board of Directors did not adopt a resolution setting forth an amendment to its articles that included a stock restriction prohibiting shareholder ownership in a competing healthcare facility.

"55. CHW's Board of Directors did not adopt a resolution declaring advisability of adopting an amendment to its articles of incorporation to include a stock restriction that prohibited shareholder ownership in a competing healthcare facility.

"56. CHW's Board of Directors did not adopt a resolution calling a special meeting of the stockholders entitled to vote for consideration of an amendment to its articles of incorporation to include a stock restriction prohibiting shareholder ownership in a competing healthcare facility or directing that amendment be considered at the next annual meeting of the stockholders.

"57. At no time did CHW's Board of Directors send a shareholder meeting notice that contained either a stock restriction or a brief summary of one.

"58. At no time did CHW present to the shareholders for a vote, so the shareholders did not vote on, a proposed amendment to its articles of incorporation which contained a stock restriction that prohibited shareholder ownership in a competing healthcare facility. CHW's shareholders never voted in favor of an amendment to the Articles of Incorporation that included the stock restriction.

"59. At no time did CHW file a certificate with the Kansas Secretary of State setting forth an amendment to the articles of incorporation with a stock restriction that prohibited shareholder ownership in a competing healthcare facility and certifying that such amendment had been duly adopted in accordance with the provisions of K.S.A. 17-6602."

The district court also made several findings relating to the parties' understanding of the bylaw provision and their conduct under the provision:

"11. Dr. Idbeis testified when the bylaw was intended to be enforced:

'Q. All right. The restrictive covenant is supposed to be enforced in the first instance if a physician who owns stock invests in another competing entity in Wichita; correct?

'A. Health care entity, that is correct.'

"12. A restrictive endorsement was placed on the final 2001 CHW distribution checks. That endorsement provided:

'By endorsement and/or deposit of this check, I hereby acknowledge that I do not own either directly or indirectly through any means of ownership all or any portion of a competing health care facility as more fully set forth in Second Amended Operating Agreement or the Amended and Restated Bylaws.'

"All defendants, with the exception of Dr. Brown who did not own stock at that time, signed and/or deposited the distribution check without complaint. No formal resolution of the CHW Board of Directors or shareholders authorized the endorsement on the distribution check."

At some point, Dr. Idbeis, a shareholder in CHW, CAW, and KHH, became involved in the development of the Kansas Medical Center. The district court found:

"18. The Kansas Medical Center (KMC), 'has been formed to acquire land, plan, develop, license, permit, own and operate a full service general acute care hospital (providing among others, general surgery, cardiovascular treatment, gastroenterology . . .). The Hospital will be located in the State of Kansas in or around the City of Wichita.'

. . . .

"22. Kansas Medical Center's Offering Memorandum projected it would earn 66% of its revenue from heart and vascular procedures. KMC projected in its revenue model that approximately 400 heart procedures would be conducted at its facility.

. . . .

"25. After investing in KMC, two defendant doctors—at that time CHW shareholders—and Dr. Idbeis were elected as the board of KMC. One of the first actions taken by these directors at their inaugural meeting was to agree that KMC would defend and indemnify Dr. Idbeis in the lawsuit brought by KHH.

"26. Dr. [Gregory] Duick [a member of the management committee of KHH] learned of the possibility that Dr. Idbeis was forming a hospital to compete with KHH in the fall of 2004. On September 24, 2004, he wrote to Dr. Idbeis requesting a copy of 'your proposed Kansas Medical Center offering memorandum and any supplemental information which is intended for the evaluation of the merits and risks of your particular investment. I will need to share this information with the Management Committee of KHH in order to understand the nature and scope of your venture and whether or not it impacts KHH, investors in KHH, etc.'

"27. Dr. Idbeis did not respond to or provide the requested information."

Despite this, the district court found that Dr. Duick was able to gather some information in the fall of 2004:

"60. In September 2004, Tom Ashcom, M.D., CEO of KHH, sought permission from Gregory F. Duick, cofounder of the KHH, chairman of KHH's management committee, and chairman of the Board of CHW, to meet with Idbeis about investing in a hospital in Andover, Kansas.

"61. Ashcom attended the meeting on September 17, 2004, with Idbeis and was presented with a nondisclosure agreement. Ashcom read the agreement and understood that the agreement prohibited him from disclosing any information he received about the potential hospital in Andover.

"62. Ashcom signed the agreement and received information about the potential hospital in Andover, including an Offering Memorandum for the Kansas Medical Center.

"63. Several days to a week after the meeting, Ashcom told Duick about the Kansas Medical Center and gave him the Offering Memorandum."

This information caused Dr. Duick to take action:

"28. Dr. Duick . . . prepared for the benefit of the Board of Cardiac Health an analysis of the similarities he observed between KHH and KMC. Dr. Duick's Comparative Analysis was presented to the CHW Board. This Comparative Analysis was based on the KMC Offering Memorandum.

"29. On October 18, 2004, the Board of Directors of CHW met at a special meeting to consider whether Dr. Idbeis violated the CHW bylaws by pursuing KMC. Dr. Duick provided the Board with a report and the comparative analysis. [He reported:]

"The KMC Offering Memorandum states that:

'The strategic plan of the Company is to employ a modified version of the hospital model fashioned and implemented by the founders of Cardiovascular Hospitals of America, LLC, a Delaware limited liability company, and used at the Kansas Heart Hospital in Wichita, Kansas.'

"The minutes reflect that a discussion was had by the directors as to whether the activities of Dr. Idbeis violated the restrictive covenant and what the intent of that

covenant was. After the discussion, the Board unanimously approved a special resolution.

"30. The special resolution found that KMC was a hospital specializing in cardiac, cardiothoracic or vascular care, and so was a competing healthcare facility as included in the bylaws. The Board found that Dr. Idbeis' participation in that hospital violated the bylaws. The Board redeemed the shares in CHW owned by Dr. Idbeis.

"31. None of the defendants whose stock was redeemed by CHW requested the Board of CHW (prior to their respective redemptions) to determine whether investing in KMC violated the restrictive investment covenant of CHW.

"32. As a result of discovery conducted in this case, a list of investors in KMC was obtained. After that, in January 2005, upon learning that the other defendants had invested in KMC, the Board redeemed their shares under the same provision that was used to redeem Dr. Idbeis' shares.

"33. Since the date of redemption of all shares, those shares have been held and retained as treasury shares by CHW. No stockholder has been granted any right by CHW to acquire any interest in those shares.

"34. The redemption price for the shares redeemed was determined in the same manner. In all instances the price that the individual doctor paid for the shares of the stock was increased by the percentage change in the Consumer Price Index between the time that the doctor purchased the stock (typically $525 per share for the first issue of stock and $596 per share for the secondary offering), and the date of redemption. The Board considered that this approach was intended by the bylaws.

. . . .

"66. As of January 2005, the [KMC] was not under construction and did not own any real estate.

"67. As of January 2005, the [KMC] did not have a medical staff, was not soliciting, accepting or treating patients, and was not open for business. The soonest this future hospital would have a building, have medical staff, and be soliciting, accepting and treating patients, if at all, would be July 2006.

"68. On February 20, 2005, CAW's Board of Directors adopted a resolution redeeming Cardiac Physicians' stock in CAW pursuant to Section 1.5(a) of CAW's bylaws. Section 1.5(a) allows redemption of CAW stock if the stockholder no longer owns stock in CHW.

. . . .

"79. Immediately following the redemptions of CHW stock in October 2004 and January 2005, there remained outstanding stock owned by non-defendant shareholders. There has been no evidence presented to the Court that this stock has been the subject of redemption efforts by CHW."

Although the Physicians are no longer shareholders, they still may maintain staff privileges at KHH. The district court found:

"16. Clinical practice at the KHH is not conditioned on owning any interest in the KHH. And, owning any interest in KHH does not limit the right of any shareholder to practice at any other facility.

"17. All of the defendant doctors have been granted associate status at KHH and may continue to practice medicine at that hospital if they choose."

## Analysis

This appeal is from an order granting partial summary judgment to the Corporations and Directors. When reviewing a motion for summary judgment, an appellate court applies the same standard as the district court:

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." ' [Citations omitted.]" *Robbins v. City of Wichita,* 285 Kan. 455, 459-60, 172 P.3d 1187 (2007).

This standard applies to each of the issues considered on appeal.

## Stock or Ownership Restrictions

Considering the first issue of law, the district court held it was legally permissible for CHW to enact a bylaw provision that imposed a limitation on certain shareholders' investment activities. Pivotal to this resolution was the court's determination that CHW's bylaw section 1.5(e) created a "restriction on ownership," which may be listed in the corporate bylaws. The Physicians argue the district court erred in this ruling because the provision is better characterized as a stock restriction, which under the Kansas General Corporation Code must be in the corporation's articles of incorporation in order to be valid.

## Standard of Review

To resolve this issue we will interpret statutory provisions in the Kansas General Corporation Code, K.S.A. 17-6000, *et seq.*, and interpret and construe corporate bylaws.

As we recently stated:

"When we are called upon to interpret a statute, we first attempt to give effect to the intent of the legislature as expressed through its language. When a statute is plain and unambiguous, we do not attempt to determine what the law should or should not be; nor do we attempt to divine the legislative intent behind it. We will not read or rewrite such a statute to add something not readily found within it. If a statute is clear as written, there is no need to resort to statutory construction. [Citations omitted.] In short, statutory interpretation begins with the language selected by the legislature. If that language is clear, if it is unambiguous, then statutory interpretation ends there as well." *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 629, 176 P.3d 938 (2008).

Similar rules apply when interpreting corporate bylaws. The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. *McGinley v. Bank of America, N.A.*, 279 Kan. 426, 431, 109 P.3d 1146 (2005).

## Code Provisions Regarding Restrictions

As the Physicians aptly assert, the Kansas General Corporation Code requires that some types of stock restrictions must be in the articles of incorporation in order to be valid. K.S.A. 17-6002(a)(4) requires that a corporation's articles of incorporation set forth basic information regarding a corporation's stock, including certain rights, limitations, or restrictions:

"The articles of incorporation shall . . . set forth a statement of the designations and the powers, preferences and rights, and the qualifications, *limitations or restrictions thereof*, which are permitted by K.S.A. 17-6401, and amendments thereto, in respect to any class or classes of stock or any series of any class of stock of the corporation . . . ." (Emphasis added.)

Additionally, K.S.A. 17-6401(a), which empowers a corporation to issue stock, requires the stock's "designations, preferences, rights and qualifications, limitations or restrictions" to be stated in the articles of incorporation or amendments thereto. Although the stock's features may be made dependent on facts outside the ar-

ticles of incorporation, the "restrictions of such class or series of stock [must be] clearly and expressly set forth in the articles of incorporation." K.S.A. 17-6401(a). This section clarifies that the term "facts" includes, "but is not limited to, the occurrence of any event, including a determination or action by any person or body, including the corporation." K.S.A. 17-6401(a).

Yet another provision, K.S.A. 17-6602, addresses the rules for amending articles of incorporation and mandates that any change to the stock or the rights of shareholders be set forth in the articles:

"(a) After a corporation has received payment for any of its capital stock, it may amend its articles of incorporation. . . . If a change in stock or the rights of stockholders, or an exchange, reclassification or cancellation of stock or rights of stockholders is to be made, the amendment to the articles of incorporation shall contain such provisions as may be necessary to effect such change, exchange, reclassification or cancellation."

While the above-quoted statutes address stock restrictions, the Corporations contend that the relevant provision in CHW's bylaws is more akin to a stock "ownership restriction" under K.S.A. 17-6426(b). The district court agreed and adopted this reasoning, citing K.S.A. 17-6426 as the primary authority for permitting the enforcement of written ownership "restrictions" on corporate securities. That statute provides, in part:

"(b) A restriction on the transfer or registration of transfer of securities of a corporation, or on the amount of the corporation's securities that may be owned by any securities holder or a group of securities holders, *may be imposed either by the articles of incorporation or by the bylaws* or by an agreement among any number of security holders or among such holders and the corporation. No restriction so imposed shall be binding with respect to securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction." (Emphasis added.)

Another subsection, K.S.A. 17-6426(c), permits a restriction on the transfer of securities or on the amount of such securities that may be owned if the restriction

"(2) obligates the corporation or any holder of securities of the corporation or any other person or any combination of the foregoing, to purchase the securities which are the subject of an agreement respecting the purchase and sale of the restricted securities; [or]

. . . ."

"(4) obligates the holder of the restricted securities to sell or transfer an amount of restricted securities to the corporation . . . , or causes or results in the automatic sale or transfer of an amount of restricted securities to the corporation or to any other holders of securities of the corporation or to any other person or to any combination of the foregoing; or

"(5) prohibits or restricts the transfer of the restricted securities to, or the ownership of restricted securities by, designated persons or classes of persons or groups of persons, and such designation is not manifestly unreasonable."

## Restriction on Class of Stock vs. Holder of Stock

The district court found several of these subparagraphs of K.S.A. 17-6426 applied to section 1.5(e) of CHW's bylaws and, as a result, found the provision was valid. In doing so, the district court rejected the Physicians' arguments that the restrictions must be in the articles of incorporation because of the requirements of K.S.A. 17-6002(a)(4) or K.S.A. 17-6401.

The focus of this duel, section 1.5, is titled: "Ownership and Transfer Restrictions." The provision stated the corporation's purpose and then stated: "Because of this purpose, certain *restrictions upon the ownership* and transfer of stock of the corporation shall be imposed as follows." (Emphasis added.) Included in the restrictions on ownership were requirements of shareholder eligibility, *e.g.*, the shareholder had to be licensed, actively practicing, and board certified in one of several listed medical specialities and had to attest that he or she was complying with certain referral and practice conditions relating to patient care. Section 1.5(b) provided, in part:

"Any shares of stock held by a person who during any period of time fails to meet the Eligibility Requirements or fails to apply for, obtain and maintain medical staff privileges or who fails to abide by the terms of an attestation statement may be redeemed, at the option of the corporation by resolution of its Board of Directors, at a redemption price equal to the market value of such shares."

Additionally, under the provision at issue in this case—section 1.5(e), quoted above in the district court's finding of fact No. 8—the shareholder would not be permitted to own all or any portion of a competing health care facility. The provision regarding ownership in a competing health care facility allowed the board to

exercise the redemption provision in section 1.5(b), although the calculation of the maximum redemption price differed.

In concluding these provisions were ownership restrictions rather than a stock restriction that must be authorized by and set out in the articles of incorporation, the district court looked to an unpublished Delaware case, *Capano v. Wilmington Country Club*, 2001 WL 1359254 (Del. Ch. 2001). Reliance on a Delaware decision is consistent with our long history of looking to Delaware for guidance when applying the Kansas General Corporation Code, which was modeled on the Delaware Code. See, *e.g.*, *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 420, 77 P.3d 130 (2003) (adopting Delaware's standard of enhanced judicial scrutiny when corporate directors take defensive measures in response to perceived threats to control); *Achey v. Linn County Bank*, 261 Kan. 669, 676, 931 P.2d 16 (1997) (decisions of the Delaware courts involving corporation law are persuasive); *In re Hesston Corp.*, 254 Kan. 941, 980, 870 P.2d 17 (1994) (the Kansas provisions of the Corporation Code are "nearly identical" to the Delaware Code).

In *Capano*, the Delaware court examined the equivalents of K.S.A. 17-6426(b) and K.S.A. 17-6401. The private Wilmington Country Club (Club) had a bylaw (expulsion bylaw) authorizing its board of directors to expel a member for cause. The Club also had a separate bylaw that required a new member, as a condition of membership, to purchase shares of Club stock that were restricted in terms of their transferability. One such restriction, which was contained in a separate bylaw provision (compulsory stock transfer bylaw), required that if a member died or was expelled, his or her shares of stock were forfeited unless the shares were transferred to the member's spouse.

Capano became a member of the Club and contracted to be bound by the bylaws. In 1999, the board of directors voted to expel Capano for cause. Although he took the opportunity to transfer his stock to his wife, Capano challenged his expulsion from the Club and argued the expulsion bylaw and the compulsory stock transfer bylaw were invalid under Delaware corporate statutory and case law.

In considering summary judgment, the Delaware court found the only genuine corporate law issue presented was whether the compulsory stock transfer bylaw provision was required, as a matter of Delaware statutory law, to be contained in the Club certificate of incorporation. The Delaware court pointed out that Capano's bylaw challenge rested upon Del. Code Ann. tit. 8, § 102(a)(4) (2000) (contents of certificate of incorporation) and Del. Code Ann. tit. 8, § 151 (1998) (classes and series of stock; redemption; rights), which provided that any rights, preferences, restrictions, and limitations relating to any class or series of stock must be set forth in the certificate of incorporation. Implicit in Capano's argument, therefore, was the premise that the compulsory stock transfer bylaw constituted a "limitation" with respect to the Club stock.

The Delaware court rejected that premise, however, because the compulsory transfer requirement was not a characteristic or attribute—such as a voting right, dividend right, or dividend or liquidation preference—that affected an entire class of stock. Instead, the compulsory transfer provision operated only against the holder of the stock (in the event of that member's death or expulsion), not against the stock itself. The Delaware court explained: "Put in statutory terms, the compulsory stock transfer provision is not a limitation 'with respect to' the [Club] shares, and is therefore not statutorily required to be set forth in the Club's charter." 2001 WL 1359254, at *3. See also Ward, Folk on Delaware General Corporation Law § 109 (2001) (hereinafter Folk) (" '[T]he by-laws are generally regarded as the proper place for the self-imposed rules and regulations deemed expedient for [the corporation's] convenient functioning to be laid down.' ") (quoting *Gow v. Consolidated Coppermines Corp.*, 19 Del. Ch. 172, 180, 165 A. 136, 140 [1933]).

Similar to the situation in *Capano*, in the present case the challenged provision operated only against certain stockholders (in the event of a stockholder investing in a competing health care facility), not against an entire class of stock. Because of this, the district court correctly classified the provision as a restriction on the amount of stock that could be owned. In other words, under the express language of the bylaw provision, certain persons were not

permitted to own shares of CHW stock; their ownership was restricted. Thus, the provision fell within K.S.A. 17-6426(b) as a restriction "on the amount of the corporation's securities that may be owned by any securities holder."

The district court highlighted the Delaware court's reasoning that "[a] cardinal rule of construction requires the Court to adopt an interpretation that harmonizes all of the statutory provisions." *Capano*, 2001 WL 1359254, at *9. See *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 88-89, 106 P.3d 492 (2005) (applying this rule of harmony). As noted by the district court, it would be harmonious to construe K.S.A. 17-6426(b) in such a way that it does not conflict with K.S.A. 17-6401, since the former permits restrictions on ownership to be imposed by corporate bylaws and because the bylaw restriction in this case defines who may *not* own CHW shares, *i.e.*, those persons who have invested in a competing health care facility. The district court further stated:

> "Whatever interpretation one gives to K.S.A. 17-6401 and 17-6410, those statutes address redemption in a manner that is inapplicable to the factual situation before the Court since those statutes address restrictions on the stock itself. Those statutes do not in any way address the remedy for violations of restrictions on ownership which are validly contained in the bylaws as permitted by K.S.A. 17-6426(b), (c) and (e)."

The district court found that the bylaw provision in this case fell into several of the nonexhaustive but expressly approved restrictions listed in K.S.A. 17-6426(c).

As we examine this conclusion, K.S.A. 17-6426(c)(4) and (c)(5) are the provisions that most obviously fit the circumstances of this case. However, as the Physicians point out, these provisions were not adopted until 2004—after CHW's directors determined the Physicians were not eligible to own stock. Similarly, these provisions were adopted in Delaware after Capano's expulsion from his club. On that basis, the Delaware court refused to rely on those statutory provisions. We agree with this analysis.

Nevertheless, the *Capano* court relied upon the statutory "catch-all" provision. The Kansas counterpart states that "[a]ny other lawful restriction . . . on the amount of securities that may be owned by any person or group of persons is permitted by this section."

K.S.A. 17-6426(e). Regarding the Delaware statute, the *Capano* court stated:

"The issue thus presented is whether the WCC forfeiture provision is an 'other lawful restriction' on the transfer of securities under (former) 8 Del. C. § 202(e). Because the statute does not define 'other lawful restrictions,' the answer must be found in the Delaware case law.

"Before Section 202 was enacted, the Delaware cases held that restrictions imposed by a corporation upon the transfer of its stock would be upheld if those restrictions were reasonable. A restriction was valid if it was reasonably necessary to advance the corporation's welfare or attain the objectives set forth in the corporate charter. A determination of the validity of those restrictions required balancing the policies served by the restrictions against the traditional judicial policy favoring the free transfer of securities." 2001 WL 1359254, at *7.

The court felt it was reasonable to conclude the Club's purposes would not be achieved if shares were freely transferable.

Similarly, CHW's bylaws provide:

"SECTION 1.5 - OWNERSHIP AND TRANSFER RESTRICTIONS. The corporation has been formed to organize, develop and own an interest in a limited liability company ('LLC') which will own and operate a single specialty free-standing cardiac, cardiothoracic and vascular care hospital (the 'Hospital'). Because of this purpose, certain restrictions upon the ownership and transfer of stock of the corporation shall be imposed."

In adopting this provision, the shareholders recognized the reasonableness of imposing membership restrictions. Also, in 1999, before any Physicians began to invest in KMC, the KHH board of directors noted that "simultaneous ownership in the Company and a competing health care facility will expose the company's methods, plans, or proprietary information to competitors which could be harmful to the Company." Such concerns are generally recognized as reasonable justifications for restricting ownership. See 18A Am. Jur. 2d, Corporations §§ 573, 574, 576.

Therefore, CHW's bylaw section 1.5(e)—as a restriction on a shareholder's eligibility to own shares and as a requirement that those shares be transferred to the corporation when eligibility is lost—is a valid restriction on ownership under K.S.A. 17-6426.

We must also consider an additional argument raised by the Physicians in a Supreme Court Rule 6.09(b) (2007 Kan. Ct. R. Annot. 45) letter. The Physicians cite *Kiekel v. Four Colonies*

*Homes Ass'n,* 38 Kan. App. 2d 102, 162 P.3d 57 (2007), a home-owner's association case. In *Kiekel,* Four Colonies, a Kansas not-for-profit corporation, amended its bylaws to restrict the right of lot owners to rent their property. The Court of Appeals determined that the bylaw amendment conflicted with the Declaration. The panel first observed that the Declaration was intended to set forth the owners' fundamental ownership rights, and the bylaws would set forth enforcement and govern its procedures. It noted that a strict construction of the Declaration showed no restrictions on the owners' rights to rent their property. The Court of Appeals held that Four Colonies could not circumvent the intent of the Decla-ration, the enabling document, by subsequently amending the by-laws. The bylaw amendment imposing rental restrictions, there-fore, was void and unenforceable. 38 Kan. App. 2d at 113.

Analogizing *Kiekel* to the present case, the Physicians argue that the stock redemption provision in the bylaw amendments was a restriction of a property right and, therefore, must have been im-posed through an amendment to the articles of incorporation, the enabling document of CHW.

We conclude *Kiekel* does not apply for several reasons. First, in *Kiekel,* the bylaw change conflicted with the Declaration. Here, there is no conflict. Second, *Kiekel* is based upon principles apply-ing to community homeowners' associations and real property, not to ownership of stock. In contrast, when stock is at issue, K.S.A. 17-6426 allows the restriction on ownership in any written agree-ment among the shareholders.

### Redemption or Purchase

Even if the restrictions can be imposed in the bylaws under the provisions of K.S.A. 17-6426, the Physicians contend that *Capano* is distinguishable because it dealt with a restriction on the transfer of stock or, alternatively, a forfeiture of the stock, not a redemption of stock. They assert that the legislature's failure to use the term "redemption" in K.S.A. 17-6426 clearly means that the statute does not apply to redemption rights, and the district court's application of the statute erroneously expanded the statute's scope.

Again, this argument requires us to interpret several Kansas statutes and the bylaws. Our review is de novo.

### Code Provisions Regarding Redemption and Purchase

As the Physicians argue, "redemption" and "purchase" are differentiated in several provisions of the Kansas General Corporation Code. K.S.A. 17-6401(b) speaks specifically about redemption: "The stock of any class or series may be made subject to redemption by the corporation at its option or at the option of the holders of such stock or upon the happening of a specified event." The terms of the redemption, including the price, "shall be stated in the articles of incorporation." K.S.A. 17-6401(b)(2).

K.S.A. 17-6410 uses both terms. K.S.A. 17-6410(a) provides that every corporation "may purchase, redeem, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares." Subparagraphs of 17-6410 then differentiate between the two terms. K.S.A. 17-6410(a)(2) provides the power of a corporation to "purchase, for more than the price at which they may then be redeemed, any of its shares which are redeemable at the option of the corporation," and subparagraph (3) refers to the power of a corporation to redeem any of its shares but does not mention a power to purchase shares.

Furthermore, there is a distinction in the statutes regarding whether the rights and powers to purchase and redeem stock must be stated in the articles of incorporation. No provision requires the articles to restate the corporation's statutory power to purchase its own stock. In contrast, "every redemption must be authorized by K.S.A. 17-6401(b) and must be carried out in accordance with that statute and the articles of incorporation." Kansas Corporation Law & Practice § 2.18 (4th ed. 1998); see also 11 Fletcher, Cyclopedia of the Law of Private Corporations § 5308, p. 533 (rev. ed. 2003) ("terms of any redemption right attaching to a class of shares must be set out in the provision of the articles of incorporation authorizing the shares, unless the articles empower the board to set such terms for authorized shares"); Folk § 151.2 (4th ed. 2005) (section 151[b] of the Delaware Code, which is equivalent to K.S.A. 17-

6401[b], allows stock to be redeemed upon the happening of any specified event listed in certificate of incorporation or resolution providing for the issuance of stock adopted by the board of directors).

Pointing to these statutory differentiations of the term, the Physicians cite the doctrine of independent legal significance. "Under the doctrine of independent legal significance, action taken under one article of the Kansas Corporation Code is legally independent and its validity not dependent upon nor to be tested by the requirements of other unrelated sections under which the same result may be attained by different means." *In re Hesston Corp.*, 254 Kan. 941, Syl. ¶ 7 (determining merger is legally distinct from redemption).

As a result of application of the doctrine, the Physicians argue a redemption is governed by K.S.A. 17-6401, and the validity of a redemption cannot be tested by the requirement of K.S.A. 17-6426, even though the final result may be the same under either provision, *i.e.*, the reacquisition of the corporation's stock.

## "Purchase" vs. "Redemption"

We reject the Physicians' argument for several reasons. First, the argument's faulty premise is that a word in a corporation's bylaws must have the meaning accorded to the word in a statute, even though it may be a word with multiple meanings. Additionally, the argument eliminates consideration of "purchase" as a form of "redemption," and as a form of redemption for which a statutory exception to K.S.A. 17-6401(b) has been made. Finally, the argument does not recognize that, although using the words separately and distinctly, the Kansas General Corporation Code does not explicitly define when a corporation's reacquisition of its own stock is a purchase and when it is a redemption.

What then is the distinction between "purchase" and "redemption"? One corporation law treatise states that "[a] redemption right held by the issuing corporation allows the corporation, at its option, to call in all or a pro rata portion of its redeemable shares, and buy them back at a specified price plus accrued dividends." 11 Fletcher § 5308, p. 532.

Another treatise explains:

"A redemption of its own shares by a corporation differs from a purchase in that a corporation redeeming shares calls for redemption shares (usually preferred) issued subject to redemption. And while a purchase may be made from any one or more shareholders, a redemption usually must be made of all the shares of the class or series subject to redemption or, if of less than all, either pro rata or by lot." 11 Cavitch, Business Organizations With Tax Planning § 147.01[2] (2001).

The use of the term "redemption" in CHW's articles of incorporation or bylaws would not fit either of these definitions.
Additionally,

"[t]he distinction made here between the terms 'purchase' and 'redemption' is not universally recognized. Modern state corporation statutes governing stock repurchases no longer distinguish between redeemable shares and other types of shares. The Internal Revenue Code refers to all corporate distributions to shareholders in return for their stock as 'redemptions.' The major stock exchanges have a tendency to do likewise. In addition, there are courts that use the term 'redemption' as the generic term for all corporate share reacquisitions. The imprecision of terminology is understandable, as the end result is similar whether there is a purchase or a redemption." 11 Cavitch, at § 147.01[2].

As these authorities illustrate, the term "redemption" has more than one meaning and a purchase is a form of redemption. Further, under these various meanings, when K.S.A. 17-6426 authorized the corporate purchase of stock pursuant to a stock restriction on transfer or ownership, it authorized a form of redemption.

Given these alternative meanings, the critical question in this case is: What would a reasonable third party understand to be the meaning of the term "redemption" in the parties' contract, the bylaws? We frame the issue in this way in light of the basic rules regarding the interpretation of corporate bylaws.

It is a well-settled rule that the bylaws of a corporation are self-imposed rules, resulting from an agreement or contract between the corporation and its members to conduct the corporate business in a particular way. *Schraft v. Leis*, 236 Kan. 28, 34-35, 686 P.2d 865 (1984). Consequently, corporate instruments such as charters and bylaws are interpreted in the same manner as other contracts. *Dutta v. St. Francis Regional Med. Center, Inc.*, 254 Kan. 690, 696-

97, 867 P.2d 1057 (1994); see *Harrah's Entertainment, Inc. v. JCC Holding Co.*, 802 A.2d 294, 309 (Del. Ch. 2002).

Where the parties have created an unambiguous, integrated written statement of their contract, the language of that contract will control, not as subjectively understood by either party but as understood by a hypothetical reasonable third party. *First Financial Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515 (1998). Additionally, even if a word has two or more meanings, a document is ambiguous only if an examination of the entire document leaves a genuine uncertainty as to which of the two meanings was intended by the parties. See *Narron v. Cincinnati Ins. Co.*, 278 Kan. 365, 369, 97 P.3d 1042 (2004).

Finally, "bylaws of a corporation are presumed to be valid, and the courts will construe the bylaws in a manner consistent with the law rather than strike down the bylaws." *Frantz Manufacturing Co. v. EAC Industries*, 501 A.2d 401, 407 (Del. 1985). This rule suggests that we should read the bylaw to use the term "redemption" in a generic sense.

We reach this same conclusion when we examine the context of the use of the word "redeem" in CHW's bylaw section 1.5 as compared to its use in the context of various provisions of the Kansas General Corporation Code. A Pennsylvania court undertook a similar analysis in a case discussed by the parties, *Wyatt v. Phillips*, 2004 WL 51693 (Pa. Commw. 2004), *aff'd* 880 A.2d 20 (Pa. Super. 2005). The court applied the Delaware General Corporation Code to its consideration of a shareholders' agreement and a consent decree, considering both as contracts. The consent decree provided for the payment of a specified sum to "consummate" the acquisition of a shareholder's interest in the corporation. The consent decree did not explicitly use the term "purchase" or "redeem," and the parties disagreed as to how the transaction should be classified. The shareholders' agreement did provide the corporation could "redeem" its stock if a third party made an offer to buy shares.

After examining the Delaware General Corporation Code requirements regarding redemption, the court determined the "shares, by their nature, were not issued with redemption rights."

2004 WL 51693, at *11. In large part, this conclusion was based upon the lack of redemption rights in the articles of incorporation. In addition, the court cited a statutory requirement that provided:

"Any stock of any class or series may be made subject to redemption by the corporation . . . provided however, that immediately following any such redemption the corporation shall have outstanding 1 or more shares of 1 or more classes or series of stock, which share, or shares together, shall have full voting powers. Del. Code Ann. tit. 8, § 151(b)." 2004 WL 51693, at °11.

Just as in *Wyatt*, the stock in this case was not structured to meet the requirements of Del. Code Ann. tit. 8, § 151(b) or its Kansas counterpart. Although arguing another point, the Physicians note that Kansas had a provision identical to Del. Code Ann. tit. 8, § 151(b) at the time the articles of incorporation and original bylaws were adopted and when Dr. Idbeis' stock was redeemed. K.S.A. 17-6401(b) (Furse). Yet, CHW had only one class of stock.

Consequently, by its nature, the stock at issue was not statutorily redeemable. Given that fact, CHW's bylaw provision was ambiguous. Moreover, because the stock was not statutorily redeemable, a reasonably prudent third party would understand the word to be used in a nonstatutory manner.

This conclusion is reinforced when we examine the purpose of section 1.5(e) of the bylaws because we conclude that the section does not meet the general purpose of a redemption provision. This same conclusion was reached under similar facts in *In re West Waterway Lumber Co.*, 59 Wash. 2d 310, 367 P.2d 807 (1962). The corporate bylaw at issue in that case read:

" '[I]n case of the death of any Stockholder or the dissolution of any corporate Stockholder or the insolvency or bankruptcy of any such Stockholder, or in case any such Stockholder voluntarily, for the period of one year, ceases to continue in the manufacture of lumber, then and in that event this corporation shall have the right to call in, retire and cancel the capital stock so held by such Stockholder, upon payment to the heirs, executors, trustees or successors in interest of such person or corporation, of an amount equal to the book value but not exceeding par value of such stock.' " 59 Wash. 2d at 315.

The petitioners contended that the bylaw's purported right of redemption was unauthorized. The Washington Supreme Court disagreed:

"Respondents suggest that the quoted portion of the bylaw is in fact a provision for redemption of common stock and as such is valid. RCW 23.01.440 authorizes redemption of preferred shares, but no mention is made in the statute of redeeming shares of common stock. . . .

"We do not believe the bylaw may properly be construed as an attempt to authorize redemption. The purpose of the provision, when taken with the rest of the bylaws and with the articles of incorporation, is clear enough. Only persons defined as 'legitimate manufacturers of lumber on the Pacific Coast' are entitled to own shares of the Export Company. A shareholder who dies or goes out of business no longer qualifies. In order to implement the reasonable restriction of eligibility, it is essential that the Export Company have available to it some means of enforcement. The power of the Export Company to reacquire its shares is not a continuing one; indeed, it arises only upon events not within its control." 59 Wash. 2d at 319.

The court emphasized that the power of redemption usually enjoys a "significantly different characteristic—aside from the controls imposed by law, it may be exercised at the will of the corporation, subject only to such restrictions regarding current financial status, impersonal selection of the group to be redeemed if less than the whole class is called, and such other limitations as may have been expressly stated." 59 Wash. 2d at 319. Considering the terms of the bylaw in context, the court concluded that it did not constitute a "redemption provision." 59 Wash. 2d at 320; see also *Glens Falls Ins. Co. v. National Bd. of Fire Underwriters Bldg. Corp.*, 63 Misc. 2d 989, 314 N.Y.S.2d 80 (1970) (reacquisition of shares, pursuant to certificate of incorporation providing that, if shareholder ceased membership in trade association or transferred shares to nonmember, shares could be redeemed at option of association at par value, was not "redemption" barred by statute which had been enacted after adoption of such certificate provision and which precluded redemption unless corporation had outstanding a class of common shares not subject to redemption).

*In re West Waterway Lumber Co.* is distinguishable in that the provisions at issue did not include the word "redemption" and the statutory schemes contained differences regarding the classes of stock that could be redeemed. Nevertheless, the rationale of the decision regarding the role of the bylaw provision as being akin to a shareholder's buy-sell agreement is persuasive. Clearly, the pur-

pose of CHW's bylaw section 1.5 was to function as an agreement among the stockholders in order to assure eligibility requirements are met. The reasons that would trigger the reacquisition of the stock are not within the control of the board of directors and would not be targeted at a class of stock. Rather, it would be targeted at the holder of the stock who no longer meets eligibility requirements as defined in the contract among the shareholders.

Other factors noted by the Washington court apply in this case as well. Corporate finance, control, preferred ownership, or other considerations such as creditors' rights or equity protection were clearly not involved. Nor is there any indication that the provision affects the corporate structure (financial or otherwise), shareholders, or creditors. Its only purpose is to limit ownership eligibility, and this purpose does not parallel the usual features of a redemptive right.

We conclude the use of the word "redemption" in CHW's bylaw section 1.5(e) is susceptible to more than one meaning and, when considered in the context of the bylaw and Kansas' statutes, would be understood by a reasonably prudent person to mean CHW had the power to purchase the stock at the predetermined price. Therefore, section 1.5, as a restriction on transfer and ownership and allowing for CHW to reacquire the stock, was valid and enforceable and did not violate K.S.A. 17-6401(b) or K.S.A. 17-6410.

As a result of this conclusion, we do not reach the district court's alternative conclusions regarding equitable considerations. Nor do we need to discuss Dr. Idbeis' argument regarding the illegality of a redemption under K.S.A. 17-6401(b), as that provision does not apply given the context of the bylaw provision.

### Competing Health Care Facility

The Physicians also take issue with the district court's ruling that KMC was a competing health care facility as contemplated in the redemption provision of CHW's bylaws. Section 1.5(e) defined a "competing health care facility" as "any medical hospital or facility specializing in cardiac, cardiothoracic, or vascular care." The Physicians argue KMC did not meet the definition because KMC was not yet constructed or a functioning hospital at the time their stock

was redeemed in October 2004 (Dr. Idbeis) and January 2005 (the remaining Physicians). They contend that KMC was incapable of competing with KHH and CHW at that time.

Further, they argue the district court erred in finding that the Directors' actions "must be judged" under the business judgment rule. In making this argument, the Physicians assert: (a) there was no room for "judgment" in the Directors' determination of whether the bylaw restriction was violated and (b) the business judgment rule does not apply to the Directors' interpretation or application of the corporate bylaws.

The resolution of these arguments will involve the interpretation of CHW's bylaws and the examination of legal issues that the district court addressed in its summary judgment ruling. Thus, as with the prior issues, we will examine these questions under the de novo standard of review. See *McGinley v. Bank of America, N.A.*, 279 Kan. 426, 431, 109 P.3d 1146 (2005); *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

Business Judgment Rule

This court has previously defined the business judgment rule as follows:

" 'The presumption that in making business decisions not involving direct self-interest or self-dealing, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest. The rule shields directors and officers from liability for unprofitable or harmful corporate transactions if the transactions were made in good faith, with due care, and within the directors' or officers' authority.' Black's Law Dictionary 192 (7th ed. 1999)." *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 417, 77 P.3d 130, 147 (2003) (quoting *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 759, 27 P.3d 1 [2001]).

Also, "[t]he burden is on the party challenging the decision to establish facts rebutting the presumption." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000).

Obviously, a key to the application of the rule is that a business judgment must be at issue, and the Physicians argue that the decision whether KMC was a competing health care facility was not

a "business judgment" decision. This argument ignores that the decision was tied directly to the board's determination of whether to "redeem" the Physicians' shares of CHW stock. In other words, the CHW's board of directors was deciding whether there was a violation of the bylaws and whether to take action.

An argument similar to the Physicians' was rejected by the Court of Appeals in *Gray v. Manhattan Med. Center, Inc.*, 28 Kan. App. 2d 572, 18 P.3d 291 (2001). Gray, a shareholder, believed that certain conduct by two other shareholders violated their lease with the corporation and also violated the bylaws. Because the bylaws were violated, Gray argued the directors must act and enforce the provisions. Contrary to this view, the board determined there had not been a violation of the bylaws. The Court of Appeals held that "[t]he business judgment rule gives a corporation's directors the authority to interpret and apply the bylaws and the lease in the corporation's best interest." 28 Kan. App. 2d at 579.

The Gray court further noted: "[T]here was a dispute regarding the interpretation of the lease and bylaws. . . . The fact that [the directors] chose a course of action Gray disagrees with does not affect the applicability or reduce the protection of the business judgment rule." 28 Kan. App. 2d at 579.

Similarly, in this case, as highlighted by the Physicians' own argument that KMC was not a competing health care facility, a judgment had to be made as to whether section 1.5(e) was violated. The bylaw vested the CHW's board of directors with discretion to make the determination, stating: "The Board of Directors shall issue such interpretations as are necessary to carry out the intent of this restriction."

Further, the decision related to business considerations. As the Corporations point out, the language of the redemption provision made it clear that the act of investment was intended to trigger the provision. In addition, the intent of the redemption provision was to "prohibit ownership of a competing health care facility, not a limitation of anyone's group practice or facilities integrated within the practice." The focus of the provision was a proactive one. In adopting the provision, the directors and the shareholders recognized that divulging business plans and proprietary information was

damaging to the business interests of the corporation. Given that conflicts start before completion of the building that houses a hospital, it would be unreasonable to conclude that CHW's bylaws did not operate until that point. Even during the planning stages, KMC was a competitor for shareholder investment, physician participation, and referral contacts and relations.

Moreover, CHW's directors interpreted the redemption provision consistent with past interpretations. It is uncontroverted that the bylaw restriction had its genesis in response to a proposed hospital on Wichita's west side, and the directors and shareholders viewed that proposal as presenting a competitor.

The decision made by CHW's board of directors was a business judgment decision.

## Are the Requirements of the Business Judgment Rule Satisfied?

The Physicians argue that, even if the business judgment rule gave CHW's board of directors the authority to interpret the bylaws, the directors cannot be protected by the business judgment rule defense because the requirements of the rule have not been met.

The business judgment rule presumes a corporate board's decision was made by disinterested directors who acted on an informed basis, in good faith, and in the honest belief the decision was in the corporation's best interest. *Gray*, 28 Kan. App. 2d at 577. The Physicians attack the application of the rule, pointing to each of these criteria.

First, they argue that CHW's directors were not personally financially disinterested in their decision to "redeem" the Physicians' shares of CHW stock. A director is interested "where the director has a financial or pecuniary interest in a transaction other than that which devolves to the corporation or to all of the shareholders generally." 3A Fletcher § 1040 (rev. ed. 2002); see also *McCall v. Scott*, 239 F.3d 808, 817 (6th Cir. 2001) ("A director is considered interested when, for example, he will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a 'materially detrimental impact' on a director but not the corporation or its stock-

holders."). The Delaware Chancery Court has described "interest" as " 'mean[ing] that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.' [Citation omitted.]" *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002).

The Physicians argue the directors' ownership interests increased because the Physicians owned 40.17 percent of the equity in CHW before the redemption of their stock. As the district court pointed out, however, the directors did not stand to receive a personal financial benefit from the stock redemption that was not shared equally by all the remaining shareholders. If there is any benefit from the redemption, it is merely the result of the fact that fewer shares are outstanding. And this is a benefit that all remaining shareholders participate in equally in accordance with their respective ownership. As the district court found, there were no "interested" directors under these circumstances.

Next, the Physicians argue the directors did not act in good faith. Citing Delaware cash-out merger cases, the Physicians argue the standard should be whether they received fair value for their share of the corporation's equity. See, *e.g., Kahn v. Lynch Communication Systems, Inc.*, 638 A.2d 1110 (Del. 1984). What this ignores is that the Physicians, as well as the other shareholders, agreed upon a method for determining a fair valuation for the shares if the circumstance ever arose where a shareholder violated the restrictive provisions. There is no evidence the CHW directors manipulated the valuation method. Additionally, as already discussed, there was a good faith basis to conclude KMC was a competitor. As a result, we conclude the Physicians have not met the burden of coming forward with evidence in response to the motions for summary judgment to show a lack of good faith.

Finally, regarding the due care criteria of the business judgment rule, the Physicians make an argument in their reply brief that the CHW directors failed to exercise due care in making the redemption valuation. They complain that Dr. Duick, the cofounder of KHH, called a meeting and prepared a report, but the board meet-

ing was held without "formal notice." The bylaws of CHW, however, expressly provided that notice of a special meeting of the directors only needed to be given to directors and that the required notice could be waived. Each of the directors in this case "waived formal notice by unanimous consent." See K.S.A. 17-6519 (waiver of notice).

The Physicians further argue that the lack of due care is illustrated by the fact the CHW directors were not given copies of KMC's offering memorandum before the meeting so they could make their own judgments instead of relying on Dr. Duick's. The sole case cited by the Physicians is *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985), *superseded by statute as stated in Emerald Partners v. Berlin*, 787 A.2d 85 (Del. Super. 2001). In *Van Gorkom*, the chairman of the board, unbeknownst to the other directors, devised a plan to sell the company and picked a sale price based on how long he felt it would take an acquirer to pay back borrowed funds. Neither the chairman nor the board obtained a valuation of the company. After he found a buyer, he called a board meeting to approve a merger, despite the fact that the board had never before considered a sale of the company. *Van Gorkom*, 488 A.2d at 866-67.

In contrast, in this case, Dr. Duick presented to the other CHW directors the offering memorandum of KMC and Dr. Duick's comparative analysis of KMC and KHH. It was uncontroverted that Dr. Duick sought additional information from Dr. Idbeis (the "manager" of KMC) about KMC and that Dr. Idbeis refused to respond to that request. Also, by the time the directors considered the other Physicians' interest in KMC, several months had elapsed. In addition, the Physicians fail to cite any authority requiring each director to conduct an independent investigation to separately uncover the facts that are reported to the directors. Nor do they identify any additional information that should have been reasonably gathered by the directors in advance of making its decision. The district court found it irrelevant that the other directors did not duplicate Dr. Duick's effort. The Physicians offer no arguments or authority contrary to these findings, and we are not persuaded otherwise.

The district court correctly concluded that the Physicians failed to come forth with material evidence to rebut the presumptions that the CHW directors were not "interested" and that it acted with due care. Under the uncontroverted facts, the directors, in applying the bylaw provision restricting ownership, made a business judgment in good faith, with due care, and within the directors' authority.

### Approval of Bylaws

The Physicians jointly, and Dr. Zepick in a separate appellate brief, also contend that several of them—specifically, Drs. Rumisek, Bajaj, Reader, and Zepick—were not present at the February 2000 meeting of CHW shareholders and, therefore, did not vote in favor of the redemption provision. Further, they argue they did not agree to and, as a result, are not subject to the redemption provision. These arguments stem from the district court's application of K.S.A. 17-6426(b), which provides that "[n]o restriction so imposed shall be binding with respect to the securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction."

The district court found it was uncontroverted that these Physicians later voted to approve CHW's amended bylaws on the December 2000 voting form. Further, the district court concluded as a matter of law this subsequent vote was the equivalent of voting in February 2000 in favor of the restrictive bylaw provision.

The Physicians argue this ruling was erroneous because it did not consider the evidence in the light most favorable to them as the party opposing summary judgment.

It is well established that, in order to create a contract, an acceptance must be unconditional and unequivocal. *Nungesser v. Bryant*, 283 Kan. 550, 568, 153 P.3d 1277 (2007). Under the uncontroverted facts of this case, there is written evidence of an unconditional and unequivocal acceptance of a proposed corporate bylaw amendment and that acceptance created a contract binding upon the shareholders. That determination is based upon a written

instrument that is unambiguous and cannot be modified by parole evidence.

The voting form stated:

"I, _____, have read and understand the Proposed Revision to the Second Paragraph of Article Four of the Articles of Incorporation of Cardiac Health of Wichita, Inc., as attached in Exhibit A; and the Amended and Restated Bylaws for Cardiac Health of Wichita, Inc., as attached in Exhibit B.
'I hereby indicate my preference below and vote to:
_____ Approve
_____ Disapprove"

The Physicians' argument is based upon the fact that the attachments—Exhibits A and B—were versions of the articles and bylaws showing additions and deletions that accommodated adding anesthesiologists as shareholders. The provisions that had been adopted in February 2000—including section 1.5(e)—were not underlined or highlighted in any way.

If we were considering amendments to the articles of incorporation, the Physicians' argument would have some validity; the voting form asked for approval or disapproval of the proposed revision to the second paragraph of Article Four. In contrast, the form did not ask for approval or disapproval of the revisions to the bylaws. Rather, it asked for approval or disapproval of the Amended and Restated Bylaws, an 11-page document that included the disputed text of section 1.5(e).

We agree with the district court's conclusion. The undisputed facts establish that the Physicians approved the bylaws and, in doing so, agreed to be bound by section 1.5(e)'s limitations on ownership.

*Penalty*

Finally, Dr. Zepick argues in his appellate brief that the redemption price in the bylaws was a penalty and, therefore, unenforceable.

The resolution of this issue involves questions of law over which we have unlimited review. See *State v. Hoeck*, 284 Kan. 441, 447, 163 P.3d 252 (2007); *Hogue v. Bruce*, 279 Kan. 848, 850, 113 P.3d 234 (2005).

Dr. Zepick first takes issue with the fact that "as a result of even a minor breach of a covenant [he] is required to part with his shares at a price that makes no effort at all to consider the growth in the value of his shares."

The price was fixed by a formula adopted by the shareholders of CHW in the restrictive bylaw. That original formula provided that the price of redemption was to be computed as provided for other redemptions; "however, the maximum redemption price shall not exceed Five Hundred Twenty-Five Dollars ($525.00) per share, increased or decreased by any percentage change in the Consumer Price Index." The price of $525 per share was the initial price paid by investors in CHW at the time the corporation was organized.

The district court found that the directors of CHW recognized the intent of the redemption provision. In other words, the shareholders would get back every dollar they invested in the corporation, and those dollars would be protected from inflation by being increased by the Consumer Price Index. Thus, by choosing to violate the stock restriction, the Physicians chose not to receive any additional increase in the value of the stock.

The district court further found that, in applying the redemption formula, the CHW directors applied it "flexibly" to fulfill the intent of the redemption provision. Therefore, the directors chose to increase the redemption price for the secondary offering of stock to $596 per share due to an increase in value caused by inflation. The court stated: "Similarly, for the doctors that were redeemed that had purchased from the corporation at a different time, for different months, the redemption price was set to equal the amount that they had paid." As a result, the district court rejected the Physicians' claim that the redemption price was a penalty and, therefore, unenforceable.

We agree for several reasons. First, the bylaw setting forth the redemption price provided for the maximum price to be paid to a shareholder whose stock is redeemed by the corporation in certain circumstances. The method set out in the bylaw was established in 2000 and approved by the shareholders.

Second, as the district court observed, under this bylaw, CHW made the Physicians whole by reimbursing them for their purchase price increased to present value based on the Consumer Price Index. In addition, the Physicians were permitted to retain all the dividends they received over the years. The Physicians did not controvert that since 1997 CHW and its shareholders received approximately $3.9 million of distributions every year. As the district court concluded: "This is not even remotely close to a penalty."

Third, Dr. Zepick's suggestion that the penalty should be the equivalent of the current high market value of the stock is contrary to Kansas law. The determination of whether there is a penalty does not depend on speculating on the performance of investments. See, *e.g.*, *TMG Life Ins. Co. v. Ashner*, 21 Kan. App. 2d 234, 253, 898 P.2d 1145 (1995) ("The reasonableness of a liquidated damages clause should be determined as of the time the contract was executed, not with the benefit of hindsight.").

Fourth, Dr. Zepick is incorrect in his contention that the redemption price is a penalty because it does not provide an exception for "minor" or "de minimus" violations. As the Physicians admitted below, such an exception would not have helped them because they all sought to own and/or manage KMC, and it was undisputed that the minimum investment of any of the Physicians in KMC was $140,000. Also, the cases cited by Dr. Zepick in his appellate brief address entirely different situations and provide no assistance. See *Evans v. Moseley*, 84 Kan. 322, 114 Pac. 374 (1911) (cattle contract penalty); *Heatwole v. Gorrell*, 35 Kan. 692, 12 Pac. 135 (1886) (penalty for breaching agreement not to engage in hardware business for 5 years); *884 West End Ave. Corp. v. Pearlman*, 201 App. Div. 12, 193 N.Y.S. 670, *aff'd* 234 N.Y. 589, 138 N.E. 458 (1922) (rent penalty). Plus, the bylaw provision specifically permits the CHW directors to make such interpretations as are necessary to carry out the intent of the provision. Therefore, if anyone had actually only committed a "minor" violation or inadvertent error, the directors had the power to allow that shareholder to quickly remedy the situation to avoid redemption.

Finally, contrary to Dr. Zepick's argument, CHW was not required to pay the larger amount stated in the articles of incorpo-

ration, rather than the amount stated in the bylaws. Dr. Zepick bases this argument on K.S.A. 17-6401(b), which provides that the manner and price formula for redemptions "shall be stated in the articles of incorporation." Dr. Zepick argues that the only price formula in CHW's articles of incorporation provided for three times the original subscription price per share, and therefore he contends CHW should have paid him three times the subscription price for his stock that was "redeemed."

What Dr. Zepick ignores is that the price he received was part of the contract between CHW and the Physicians as shareholders. See 12B Fletcher, § 5906.120, p. 406 (rev. ed. 2000) ("Shareholders may agree in advance to fix the fair value of their shares."). This was not a typical case of stock redemption, it was a limitation on stock ownership which the Physicians, Dr. Zepick included, approved.

The district court correctly rejected the notion that the redemption price was a penalty. A bylaw provision that establishes a formula for the calculation of the price to be paid when a corporation reacquires stock from a shareholder is not a penalty even if the formula varies depending upon the circumstances of the reacquisition and is not based upon market value.

Affirmed.

DAVIS, J., not participating.

MCANANY, J., assigned.