NOT DESIGNATED FOR PUBLICATION

No. 115,586

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BOB WILLIAMS and BARBARA
WILLIAMS, for themselves and on behalf of THE CHEROKEE
STRIP HOMEOWNERS ASSOCIATION,
*Appellants*,

v.

TOMMY GENE RANDALL, SUZETTE C. RANDALL, *et al.*,
*Appellees*.

MEMORANDUM OPINION

Appeal from Cowley District Court; LADONNA L. LANNING, judge. Opinion filed April 14, 2017.
Affirmed.

*Bob Williams* and *Barbara Williams*, appellants pro se.

*Mark W. Krusor*, of Taylor & Krusor, LLC, of Winfield, for appellees.

Before PIERRON, P.J., HILL, J., and WALKER, S.J.

*Per Curiam*:  Arguing that certain actions taken at the annual meeting of their
homeowners association were void due to a lack of a quorum, Bob and Barbara Williams
filed a declaratory judgment action seeking relief. The court granted them some relief but
denied their request for attorney fees. We affirm the district court's order.

1

*Factions developed in the homeowners association.*

By virtue of owning a home near a small airstrip, Bob and Barbara Williams are members of the Cherokee Strip Homeowners Association. They brought this suit for themselves and on behalf of the Association against the other members. They sought a judgment from the court declaring that all actions taken at the May 6, 2013, Association meeting were void for lack of a quorum. They also contended that all actions subsequently taken by the Board were void because the Board was not properly elected; that the amendments made to the Association bylaws and the Declaration of Covenants made at the meeting were void because the Board did not follow the correct procedures required for amendment of those documents. The Williams also asked the court to direct how a quorum was to be calculated for future meetings. They also sought reimbursement of their attorney fees for bringing the action.

*After a brief review of the bylaws, we detail some of the actions of the Association.*

In order to establish a context, a review of the Association's bylaws is helpful here. Article 3, section 4 of the bylaws defines quorum:

> "The presence at the meeting of members of one-half (1/2) of the membership shall constitute a quorum for any action except as otherwise provided in the Articles of Incorporation, the Declaration, or these By-Laws. If, however, such quorum shall not be present or represented at any meeting, the members present shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until quorum as aforesaid shall be present or be represented."

Over the years, the Association held annual member meetings without a quorum. At those meetings, board elections were held and business was conducted. The minutes show that on several occasions prior to May 2013, the Association held meetings and conducted business without a quorum. Directors were elected at those meetings who then

2

served under the claim and color of an elected director. The failure to require a quorum was due, at least in part, to a misunderstanding of how a quorum was to be computed. Throughout the history of the Association, absentee or mail-in ballots were counted toward the number for a quorum. There was confusion about whether a quorum was based on the membership or the lot count and about how members could be "represented."

The meeting on May 6, 2013, was no exception. At that annual member meeting, 12 of 40 members were physically present. Neither Bob nor Barbara Williams attended the meeting, though they were given notice of the meeting. No member gave a written proxy. Of the 12 members present, 6 were co-owners of one or more lots with a person who was not present. Two were co-trustees of two trusts, each of which owned one lot. No objection to the lack of a quorum was raised at the time of the meeting. At the meeting, a vote was held to elect board members. Twenty ballots were cast, including seven absentee ballots cast from unidentified members.

The Board allowed absentee ballots to be mailed in anonymously or submitted to any board member. The Association had no mechanism to determine whether a member submitted absentee ballots to more than one board member. The Association also had no way to determine whether the co-tenant of a person who submitted an absentee ballot also voted, even though only one vote per lot was permitted.

Between May 7, 2013, and May 9, 2013, Bob Williams spoke with several former and acting board members about his concern that there was no quorum at the May 6, 2013, meeting. On May 10, 2013, Bob exchanged letters with the Board president about the lack of a quorum and requested that the Association proceed in accordance with its bylaws rather than treat the May 6 meeting and actions taken there as valid. The president rejected the request. Bob Williams repeatedly brought the issue to the attention of other members of the Association, including acting members of the Board. But the Board did

not recognize the lack of a quorum. Instead, after receiving advice from an attorney, a majority of the acting Board adopted the position that a quorum of members was present at the May 6 meeting.

At the Board meeting on July 1, 2013, the Williams again brought up their complaint that a quorum was not present at the May 6, 2013, meeting.

*The Board takes action against the Williams.*

The Association collected assessments from its members annually. Article XI of the bylaws set out the requirements for payment, what to do if there is a delinquency, and the assessment of interest if unpaid:

> "[E]ach member is obligated to pay to the Association annual and special assessments which are secured by a continuing lien upon the property against which the assessment is made. Any assessments which are not paid when due shall be delinquent. If the assessment is not paid within thirty (30) days after the due date, the assessment shall bear interest from the date of delinquency, at the rate of 9 percent (9%) per annum, and the Association may bring an action at law against the Owner personally obligated to pay the same or foreclose the lien against the property, and, interest, costs, and reasonable attorney's fees of any such action shall be added to the amount of such assessment."

The Declaration of Covenants empowered the Board to set the amount and due date of the annual assessment. The minutes of the May 6, 2013, meeting reflect that the Board voted in favor of setting the annual member assessment fee at $200. The minutes reflect no formal vote to set a due date for the 2013 assessments. But the May 6, 2013, minutes note that the $200 per lot assessments were due June 1 and past due July 1, at which time 9 percent interest would be charged.

4

Since 1980, the Williams had paid their assessments by making small payments throughout the year as permitted by the Board. They did so without submitting any payment plan or being requested to do so.

In 2013, the acting secretary, without a vote of the Board, charged the Williams a late fee. On September 9, 2013, the Board voted to serve a notice for delinquent assessments against the Williams and put a lien on the Williams' property. But no lien was ever recorded on the property.

The Williams had not paid their 2013 assessments in full and no payment plan had been submitted or approved as of December 2013. At the December 2, 2013, board meeting, the Board voted to suspend the Williams' voting rights "on the assessment nonpayment changes" to the bylaws until their assessments were paid in full. The Board cited article VII, section 1(B) of the bylaws as the authority for their actions.

Article VII, section 1(B) of the bylaws allowed the board of directors to "[s]uspend the voting rights and right to use of the recreational facilities of a member during any period in which such member shall be in default in the payment of any assessment levied by the Association."

The due date for 2014 assessments was set by the Board as August 7, 2014. The Williams mailed a check for the 2014 assessments on September 4, 2014. The secretary of the Association sent the Williams a note claiming that they owed interest.

*The Board tries to amend the bylaws.*

The Board's dealings with the Williams prompted some proposed amendments to the Association bylaws.

The December 2013 board minutes note that a special meeting of the Board and members was to be held on January 6, 2014. The notice stated: "ENCLOSED ARE VOTING BALLOTS AND PROPOSED CHANGES TO OUR BY-LAWS. PLEASE MAIL IN YOUR BALLOTS OR GIVE THEM TO A BOARD MEMBER IF YOU CAN NOT MAKE IT TO THE MEETING. ABSENTEE BALLOTS COUNT TOWARDS MAKING OUR QUORUM."

The proposed amendments would have:

- amended the quorum requirements in Article III with respect to meetings of members;
- amended Article VI dealing with meetings of directors; and
- amended Article XI dealing with assessments.

The bylaws stated that they "may be amended at a regular or special meeting of the members, by a vote of two-thirds (2/3) of the members."

The January 2014 meeting was cancelled due to weather conditions. Then, on March 10, 2014, the Board held its meeting. The minutes from that meeting reflect that ballots regarding the proposed bylaw amendments were counted. The Board signed and recorded a document purporting to amend Article XI of the bylaws dealing with assessments. But the proposed amendments to the bylaws did not pass by a vote of 2/3.

The Declaration of Covenants states that it may be amended by "an instrument signed by not less than seventy-five percent (75%) of the Lot Owners. Any amendment must be recorded."

On April 14, 2014, the Board held another meeting. Four days later, the acting Board president, Richard Girard, filed with the Cowley County Register of Deeds a

6

document entitled, "Amended Declaration of Covenants, Conditions and Restrictions." It had not been signed by 75 percent or more of the lot owners.

On May 5, 2014, the Association held a member meeting. Thirteen members attended in person. Neither Bob nor Barbara Williams attended the meeting. No member had a written proxy in effect. Nevertheless, the acting Board determined that a quorum was present and no objection was made at the time of the meeting. New directors were elected. A total of 18 ballots were voted and counted.

*The Williams take legal action.*

The trial court granted the Williams some relief. It ordered that with respect to the prospective actions of the Board and its members:

- A quorum now must be met by the physical presence or written proxy filed with the secretary of the organization. Absentee ballots are allowed under K.S.A. 2016 Supp. 58-4614 unless the bylaws are later amended to prohibit them. Absentee ballots are to be used *only* for voting, not for determining whether a quorum is present.
- One vote per lot even if more than one person owns the lot.
- The court voided the amendments to the bylaws and Declaration of Covenants which were filed with the register of deeds for failing to follow the procedure requiring those documents.
- It ordered the Board to file with the register of deeds a rescission of the amendments and the document shall specifically state "'prior by-laws and the Declaration are, were, and remain in full force and effect.'"

But the trial court denied other relief:

- By not attending, the Williams had waived their objections to the lack of a quorum for both the May 2013 and May 2014 meetings.
- The court held that officers elected at both meetings were de facto officers.
- Both statutes relied upon by the Williams—K.S.A. 17-6501 and K.S.A. 17-6505—are not applicable to this situation where meetings of the Board were actually held.
- All parties admit that the calculation of the quorum has been flawed through the years due to misinterpretation of the bylaws. The Board was acting on the advice of their attorney. It was following the language of the bylaws with no intent or advice sought by the Board at the beginning. It attempted to amend to comply with the law.
- The Williams have not met their burden of proof regarding any breach of fiduciary duty or damages by the Board. (The court dismissed this claim).

The court made its ruling denying attorney fees very clear:

"The Court hereby denies any attorney's fees. I order the defendants, however, to pay all filing fees of the lawsuit and all filing fees of the Register of Deeds in correcting all these documents.

"Both sides have made a mess of this corporation. Both have not followed the governing documents. I am not sure that they have even referred to them since they put in place, until the suit was filed.

"Both have admittedly, by mistake, applied the wrong calculation for a quorum. Both have treated the corporate activity with disregard to purpose and procedures of the corporation. Both have then tried to use the letter of the law against the other when the dispute arose. Both come to court with unclean hands and present the Court with a mess to untangle. Therefore, both bear the cost of fixing their joint mess."

8

On appeal, the Williams challenge the court's ruling that they waived their claims about the lack of a quorum because they were voluntarily not present at the meeting. They contest the court's conclusion that the Board did not breach a fiduciary duty. The Williams also challenge the denial of attorney fees.

*Did the Williams waive their claims?*

The bylaws of a corporation are self-imposed rules, an agreement between a corporation and its members to conduct corporate business in a particular way. As a result, bylaws are interpreted in the same manner as other contracts. Appellate courts exercise unlimited review over their interpretation. *Kansas Heart Hospital v. Idbeis*, 286 Kan. 183, 194, 204, 184 P.3d 866 (2008).

Our statute, K.S.A. 2016 Supp. 58-4621(a), allows a member to "bring an action to enforce a right granted or obligation imposed by this act, the declaration, or the bylaws." The Williams seek to enforce the quorum requirement in the Association bylaws.

Our Supreme Court has explained the concept of waiver as a voluntary and intentional act:

> "Waiver implies a party has voluntarily and intentionally renounced or given up a known right, or has caused or done some positive act or positive inaction which is inconsistent with the contractual right. Waiver is consensual in nature but the intention may be inferred from conduct and the knowledge may be actual or constructive." *Schraft v. Leis*, 236 Kan. 28, Syl. ¶ 7, 686 P.2d 865 (1984).

We also know that corporations have the power to waive provisions of their bylaws introduced for the protection of the company, and they may do so expressly or impliedly. Corporate bylaws may also be waived by a continued disregard thereof by the parties for whose benefit they were enacted. *Schraft*, 236 Kan. 28, Syl. ¶ 2 (citing18 Am.

9

Jur. 2d, Corporations § 173); 18A Am. Jur. 2d, Corporations § 271. Bylaws may be amended informally as may be evidenced by a course of proceeding or conduct on the part of a corporation inconsistent with the bylaws purporting to be amended. 18A Am. Jur. 2d, Corporations § 269. "Acquiescence in the corporate act for an unreasonable length of time also constitutes an estoppel." 18B Am. Jur. 2d, Corporations § 1725.

"Estoppel involves an assertion of rights inconsistent with past conduct, silence by those who ought to speak, or situations where it would be unconscionable to permit persons to maintain a position inconsistent with one in which they have already acquiesced." *Schraft*, 236 Kan. at 36.

A closer examination of *Schraft* is useful here. In *Schraft*, a shareholder of a closely held corporation sued Leis, the other shareholder and general manager of the corporation, alleging that Leis had received an unauthorized salary. The bylaws of the corporation provided that the board of directors had authority to appoint a general manager and to fix the salary of the general manager. But there was never a formal action setting a specific salary for the general manager. By informal agreement, the salary was initially set at $200. The salary was later increased without formal corporate action. The Kansas Supreme Court held that Schraft ratified the setting of Leis' salary by a method other than that authorized in the bylaws. Therefore, the use of the bylaws was waived by both parties. 236 Kan. at 35.

Here, the trial court's factual findings on this point are pertinent in that they detail exactly how the Association conducted its affairs:

"Through the years the organization has been run very informally, and often in a lackadaisical manner. Both sides admit to errors being made in how the quorum was determined. Both sides acknowledge many meetings have been held and business

10

conducted without a proper quorum. Sometimes objection was made and a quorum was required; most of the time nothing was done.

"Plaintiffs have been active members in the Association through the years, serving on the Board and as officers. They attended meetings, and didn't attend meetings. They objected to a quorum, and they didn't object to quorum, as did all other members, it appears to the Court.

"Plaintiffs were not present at the May 201[3] meeting, and therefore couldn't and didn't object to a lack of quorum at that time, and until after the meeting was held, business was conducted, and the new board was elected.

"Plaintiffs then informally contacted Board members with their objections, and also brought the matter to the Board at their meeting in July of 2013.

"The Board consulted with its attorney, who advised that nothing was out of order. And the Board so informed plaintiffs that it believed a quorum was present based upon past practices, and that nothing further needed to be done."

The record supports the court's ruling. There was rarely a quorum at the meetings, yet, directors were elected, assessment amounts and due dates were set, and other business conducted. The Williams were present and participated in several of these meetings. Barbara Williams even served on the Board for several years. At the 1991 meeting, the members discussed eliminating the Association's liability insurance. But "due to the lack of a quorum, it was determined to continue with the present policy." The members did, though, elect directors and conduct other business. Throughout the history of the Association, absentee ballots were counted toward the number for a quorum. The Williams certainly had notice that meetings could proceed and directors elected without a quorum based on past practices.

Going further, the district court's legal conclusion is supported by *Schraft*. The Williams and the Association waived the quorum requirement (as written in the bylaws) by their continued disregard of the provision. See *Schraft*, 236 Kan. 28, Syl. ¶ 2. The Association's course of conduct throughout its history was to use absentee ballots to count towards a quorum. See 18A Am. Jur. 2d, Corporations § 269. The Williams

11

acquiesced to this practice for an extended period. See 18B Am. Jur. 2d, Corporations § 1725.

We note that K.S.A. 2016 Supp. 58-4613(a) permits a quorum to be determined using absentee ballots. Thus, the Association's practice of counting absentee ballots towards a quorum was not against public policy.

*We find no error in the trial court denying attorney fees.*

The Williams suggest several theories on why they should be awarded attorney fees:

(1) The Board breached its fiduciary duties in four ways;
(2) by operation of the statute—K.S.A. 2016 Supp. 58-4621(a); and
(3) the common-benefit exception.

We will address their theories in that order.

**The Four Alleged Breaches of Fiduciary Duty**

The trial court concluded that the Williams failed to prove this point. The Board was acting upon the advice of its attorney and was trying to follow the language of the bylaws.

To us, the Williams argue that the Board deliberately and intentionally undermined and circumvented the rules of the Association and Kansas law. They complain about four actions of the Board:

(1) holding member meetings without a quorum;

12

(2) the use of absentee ballots;

(3) the suspension of the Williams' voting rights; and

(4) the unauthorized amendment of the bylaws and Declaration of Covenants and the filing of the purported amendments with the register of deeds.

It is these wrongful acts that the Williams contend are proof of the breach of fiduciary duty by the Board.

When reviewing a district court's findings of fact and conclusions of law, an appellate court applies a twofold standard of review. The court's factual findings are reviewed under the substantial competent evidence standard. Its conclusions of law are subject to unlimited review. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

Kansas law provides that officers and members of the board of directors of a common interest community "shall exercise the degree of care and loyalty to the association required of an officer or director of a corporation organized, and are subject to the conflict of interest rules governing directors and officers, under existing law." K.S.A. 2016 Supp. 58-4609(a). The statute specifically provides that the board of directors may not: "(1) Amend the declaration except as provided by law other than this act; (2) amend the bylaws." K.S.A. 2016 Supp. 58-4609(c).

The duties of the board of directors create certain obligations. Officers and directors of a corporation are under a strict fiduciary duty to act in the best interest of the corporation and the stockholders. The standard by which the conduct of a director is to be

13

judged is the measure of attention, care, and ability which the ordinary director and officer of a corporation of a similar kind would be reasonably and properly expected to exercise. *Sampson v. Hunt*, 233 Kan. 572, 584, 665 P.2d 743 (1983).

> "The degree of care required depends upon the subjects to which it is applied, the particular circumstances of the case, and the usages of business. Generally, however, directors of a corporation, especially where they act without compensation, are bound to exercise ordinary care and diligence but no more. Directors and officers are not insurers. Nor are the directors and managing officers of a corporation, as a rule, liable to stockholders for slight omissions from which a loss which results to the corporation could not reasonably have been expected. However, directors are liable for losses or injury resulting from their gross negligence." 18B Am. Jur. 2d, Corporations § 1445.

We must keep in mind that Kansas adheres to the business judgment rule. The business judgment rule presumes a board's decision was made by disinterested directors who were informed, acted in good faith, and had an honest belief their decision was in the corporation's best interest. The business judgment rule protects acts by disinterested directors who have fulfilled their duty to inform themselves of all material facts reasonably available to them and then acted with due care. *Kansas Heart Hospital*, 286 Kan. at 209; *Gray v. Manhattan Med. Center, Inc.*, 28 Kan. App. 2d 572, 577, 18 P.3d 291 (2001). The burden is on the party challenging the board's decision to rebut the presumption. *Kansas Heart Hospital*, 286 Kan. at 209.

> "'It is not the function of the court to manage a corporation nor substitute its own judgment for that of the officers thereof. It is only when the officers are guilty of willful abuse of their discretionary power or of bad faith, neglect of duty, perversion of the corporation purpose, or when fraud or breach of trust are involved, that the courts will interfere.'" *Gray*, 28 Kan. App. 2d at 577 (quoting *Cron v. Tanner*, 171 Kan. 57, 64, 229 P.2d 1008 [1951]).

14

When we look at the four acts that the Williams complain about, we see no reason to doubt the trial court's findings. We look at the first two—the lack of a quorum and use of absentee ballots.

**Meetings Without a Quorum and Use of Absentee Ballots**

The evidence supports the district court's factual findings. The parties stipulated that over the years, the Association held annual member meetings without a quorum. At those meetings, directors were elected and other business was conducted. The failure to require a quorum was due, at least in part, to a misunderstanding of how a quorum was to be computed. There was testimony that throughout the history of the organization, absentee or mail-in ballots were counted toward the number for a quorum. Both parties testified that there was confusion about whether a quorum was based on the membership or the lot count and about how members could be "represented." After the May 2013 member meeting, some of the board members discussed the quorum issue with Bob Williams at an informal meeting. One board member proposed that they take the issue to an attorney, but Bob declined. The parties stipulated that after Williams brought the quorum issue to the attention of the board members, a majority of the acting Board adopted the position that a quorum was present at the May 6, 2013, meeting after consulting an attorney.

*Gray* supports the district court's legal conclusion. With regard to the quorum issue and the use of absentee ballots, there was a dispute regarding interpretation of the bylaws. Both sides admitted to confusion about how a quorum was to be determined. After the Williams later objected to the lack of a quorum at the May 2013 meeting, the Board discussed the issue with Bob Williams. The Board consulted with legal counsel and took the position that a quorum was present at the meeting based on past practices of the Association.

15

**Suspension of the Williams' Voting Rights**

The evidence supports the trial court's findings on this point, as well. The minutes of the December 2, 2013, board meeting reflect that the Board voted to suspend the Williams' voting rights "on the assessment nonpayment changes" to the bylaws until their assessments were paid in full. The Board cited Article VII, section 1(B) of the bylaws.

The court's legal conclusion is correct. The Williams do not explain how the Board acted improperly by suspending their voting rights, other than their issue with the quorum determination. The suspension of their voting rights was clearly authorized by the bylaws.

**Unauthorized Amendments**

The parties stipulated that the acting president of the Board filed with the register of deeds a document entitled, "Amended Declaration of Covenants, Conditions and Restrictions." The amended Declaration of Covenants removed a section relating to architectural control and changed a section relating to assessments to be consistent with the amended bylaws. The parties stipulated that the amended Declaration of Covenants was not signed by 75 percent or more of the lot owners as required by the Declaration. In other words, the document filed with the register of deeds was a legal nullity.

More importantly, the Williams did not show bad faith on the part of the Board. There was no evidence the Williams brought this issue to the Board's attention before filing suit. Generally, before filing a derivative suit, a shareholder must make a demand upon the corporation requesting the desired action to be taken. See *Gray*, 28 Kan. App. 2d at 576. However, K.S.A. 2016 Supp. 58-4621 does not impose such a requirement. But here, it does not seem appropriate to award attorney fees to the Williams when this

16

issue could have been resolved without litigation. Before trial, the Association agreed that the amendments were done improperly.

The district court did not err in concluding that the Williams failed to meet their burden of proof of a breach of a fiduciary duty or damages therefrom. We turn now to the Williams' statutory claim for attorney fees.

*Were attorney fees required to be paid under K.S.A. 2016 Supp. 58-4621(a)?*

This statute is part of the Uniform Common Interest Owners Bill of Rights Act adopted by our legislature in 2010. Its purpose is to clarify rights and duties of all concerned, including

> "to establish uniform rules of law to clarify the rights and duties of unit owners and associations in all forms of common interest communities, to provide for the effective operation of common interest communities in the interest of their owners and their residents and to address current and potential areas of conflict and tension between unit owners and associations, boards and managers in a comprehensive and balanced manner." K.S.A. 2016 Supp. 58-4601(c).

With this legislation, the legislature sought uniformity, fairness, and effectiveness.

The Act covers the adoption and amendment of bylaws, assessments, voting rights, election of the board of directors, member meetings, quorum requirements, and voting procedures. See K.S.A. 2016 Supp. 58-4601 *et seq.* The Act imposes an obligation of good faith in performance and enforcement of contracts and duties governed by the Act. K.S.A. 2016 Supp. 58-4604.

The Act gives certain legal rights to members to sue. A member may "bring an action to enforce a right granted or obligation imposed by this act, the declaration, or the

17

bylaws. The court may award reasonable attorney's fees and costs." K.S.A. 2016 Supp. 58-4621(a). The award of attorney fees is discretionary with the district court because the statute states "[t]he court *may* award." (Emphasis added.) But the statute provides: "The remedies provided by this act shall be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed." K.S.A. 2016 Supp. 58-4621(c).

A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). The party asserting the trial court abused its discretion bears the burden of showing such abuse of discretion. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013).

The Williams argue that this suit became necessary because actions taken by the Board were in violation of the bylaws and Declaration of Covenants. They contend it would be fair and equitable for all the Association members to share the cost.

We cannot ignore the fact that the Williams' lawsuit resulted in changes in how the Association now conducts its business. The Williams brought the quorum issue to the attention of several board members in May 2013. On May 19, 2014, the Williams filed suit. It was not until February 3, 2015, the Association communicated to the Williams that the Association agreed the attempted amendments were done improperly. But the Board did not rescind the amendments. In April 2015, the Board adopted changes in its practices consistent with the relief requested by the Williams. Specifically, the Board decided to calculate the presence of a quorum based only on the number of members present in person or represented by a written proxy. The Board decided absentee ballots would not to be used in determining a quorum or for election of directors.

18

We realize, too, that litigation may have been avoided. The quorum issue was caused by all parties. The Williams participated in the Association for many years in which the quorum requirement of the bylaws was disregarded. When the Williams did complain about the quorum issue, the Board tried to resolve the issue informally.

The Williams did not bring the problem with the amendments of the bylaws and the Declaration of Covenants to the attention of the Board before filing suit. Ultimately, the Association agreed that the amendments had been done improperly.

The Williams bear the burden of showing an abuse of discretion. See *Northern Natural Gas Co.*, 296 Kan. at 935. But the Williams do not explain how the district court's decision was based on an error of fact or law. And, based on the facts, we cannot say that no reasonable person would have taken the district court's position. There is no reason to set aside the trial court's holding and award attorney fees on this point.

*Because there is an applicable statute that controls this issue, we will not explore the equitable remedy "common benefit."*

Common benefit is an equitable exception to the general rule that attorney fees are not recoverable in the absence of statutory authority. It applies when "'the plaintiff's successful litigation confers "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionally among them.'" *Schell v. OXY USA Inc.*, 814 F.3d 1107, 1126 (10th Cir. 2016); *Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1480, 1481-82 (10th Cir. 1993). The exception can be applied in a shareholder derivative suit to ensure all shareholders contribute to the cost of the litigation from which they benefited. *Schell*, 814 F.3d at 1126.

19

In this case, since K.S.A. 2016 Supp. 58-4621(a) affords the trial court an option to award attorney fees at its discretion, we will not consider the equitable exception.

Affirmed.